IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | CASE NO. 5:15-CR-44 (MTT) |
| ) | |
| TERRENCE DEON CARTWRIGHT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**ORDER**

Defendant Terrence Deon Cartwright, who has been charged with possession of a firearm by a convicted felon in violation of Title 18, United States Code, Section 922(g)(1) and 924(a)(2), has moved to suppress evidence obtained on September 17, 2015. (Doc. 27). Cartwright has also moved to reveal "the identity, present location and previous criminal record" of the confidential informant. (Doc. 32). The Court held a hearing on the motions on February 10, 2016. (Doc. 33). The motions are **DENIED**.

**I.   FACTS**

Around 12:00 AM of September 17, 2015, Detective Khan, of the Milledgeville Police Department, received information in a phone call from a confidential informant ("CI") that Cartwright, whom Khan knew to be a convicted felon, had a firearm and could be found at the residence of James Brown, 608 South Jefferson Street. (Doc. 37 at 13:21-14:4, 18:22-19:21).

Detective Khan began working with the CI in early September 2015. (Doc. 37 at 16:17-21). Khan's initial contact with the CI led to a face-to-face meeting. (Doc. 37 at 29:24-30:9). As a result of the meeting, Khan stated that the CI was paid for certain

information.  (Doc. 37 at 17:18-22, 33:10-12).  Khan also affirmed that the CI had a criminal record but no pending charges.  (Doc. 37 at 17:23-18:6).

According to Khan, the CI gave law enforcement "information that a specific house would have narcotics at it, which when we went to that house we were able to find what they were telling us."  (Doc. 37 at 15:19-24).  The CI also provided specific information about other people with probation warrants.  (Doc. 37 at 17:5-7).  Khan testified that the "information concerning the location of those individuals … resulted in [their] successful apprehension… ."  (Doc. 37 at 17:8-11).  Khan said that at no point had the CI provided inaccurate or unreliable information.  (Doc. 37 at 17:12-14).

Khan testified that before the September 17 phone call, the CI provided information identifying the individual who purchased the firearm for Cartwright.  (Doc. 37 at 14:8-11).  Khan said she also received information from a different law enforcement agency corroborating the purchaser's identity.  (Doc. 37 at 14:14-16).

Khan testified that the September 17, 2015 phone call was from the CI's telephone number and that she recognized the CI's voice when she answered the call. (Doc. 37 at 18:11-19:3, 28:15-19, 35:9-20).  Finally, Khan testified that the CI told her that Cartwright would be at 608 South Jefferson Street in possession of the same firearm.  (Doc. 37 at 18:22-19:3).

After Khan received the September 17 call from the CI, she shared Cartwright's status as a convicted felon and the details of the CI's phone call with other officers, namely, Detective January, Officer Chapple, and Sergeant McNeely, all of the Milledgeville Police Department.  (Doc. 37 at 19:19-20:4, 39:15-20, 76:17-23).  Khan then directed Detective January to surveil 608 South Jefferson Street.  (Doc. 37 at

20:19-21:4, 87:16-25).  Around 1:00 AM, Detective January saw Cartwright leave 608 South Jefferson Street and start walking towards South Jefferson Street.  (Doc. 37 at 22:20-24).  Around that same time, Officer Chapple was directed to the area with the information that Cartwright was a felon and possibly in possession of a firearm.  (Doc. 37 at 39:11-40:7; 41:21-24).

Chapple arrived first.  (Doc. 37 at 41:20).  He pulled up to 608 South Jefferson Street, without his warning lights or his sirens on, and stopped his vehicle on the street.  (Doc. 37 at 42:9-43:1).  He got out of his vehicle, turned his body camera on, and approached Cartwright who was standing in a driveway near 608 South Jefferson Street.  (Doc. 37 at 42:3-8, 43:13-16).  Chapple then asked Cartwright, "What you doing back in town?"  (Doc. 37 at 61:21-25).

Immediately after Officer Chapple's initial contact with Cartwright, Sergeant McNeely arrived at the scene.  (Doc. 37 at 78:10-16).  McNeely testified that he pulled up in his own vehicle, walked up to Cartwright, and told him to "Put your hands on top of your head."  (Docs. 37 at 46:22-24, 78:10-16; 33-3 at 0:20-0:25).  McNeely did so because he could smell the "pungent odor" of marijuana.  (Doc. 37 at 78:10-16).  Likewise, Chapple testified he smelled an "intense" smell of marijuana.  (Doc. 37 at 51:5-7).  McNeely then said, "You think I can't smell that?"  (Docs. 37 at 65:2-10; 33-3 at 0:25-0:27).  After McNeely told Cartwright for the second time to place his hands on top of his head, Cartwright complied and said that "[h]e had a little bit of weed on him."  (Docs. 37 at 47:22-25, 72:6-11; 33-3 at 0:28-0:31).

Then, Sergeant McNeely removed Cartwright's backpack, and Officer Chapple handcuffed Cartwright.  (Doc. 37 at 72:4-11; 79:25-80:6).  Chapple began by first

3

performing what McNeely referred to as a "pat down." (Doc. 37 at 81:6-15). Chapple testified that "[he] was already standing on [Cartwright's] right side so [he] went straight to [Cartwright's] right side waistband and [his] hand landed right on the gun." (Doc. 37 at 53:24-54:4, 49:18-20). Cartwright then told the law enforcement officers that the handgun was not loaded (It was later confirmed that bullets were in the gun's magazine, but not in the chamber.). (Docs. 37 at 49:15-17, 52:22-53:6; 33-3 at 0:56-1:07). After Chapple recovered the handgun, McNeely took the handgun back to his vehicle to perform a "safety clear." (Doc. 37 at 81:10-20). During that time, Chapple was "[s]earching him, incident to arrest," checking the pockets of Cartwright. (Doc. 37 at 51:25-51:2). Chapple recovered a small scale in Cartwright's pocket and a bag of marijuana wrapped in Cartwright's underwear. (Doc. 37 at 51:11-16, 54:13-21, 70:10-12). Chapple then took Cartwright over to his vehicle and placed him under arrest. (Doc. 37 at 82:5-8, 84:18-20). During Chapple's search of Cartwright before he was placed in the patrol car, Cartwright said, "You're a dummy if you don't have a gun out here these days." (Doc. 33-3 3:19-3:22).

Cartwright was charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Doc. 1). Cartwright has moved to suppress "all evidence seized" during the stop because "there were no factual bases … to indicate the Defendant was armed and dangerous and the allegations [by the informant] did not provide sufficient indicia of reliability" to justify the stop. (Doc. 27 at 3). The Government responds that this was a "confidential informant" that had "provided reliable information" that was "corroborated by police surveillance" and consequently "no Fourth Amendment violation." (Doc. 30 at 5-7). Finally, Cartwright moves to compel the

4

disclosure of the identity of the confidential informant in order to "corroborate [a] justification defense" and to "ascertain the reliability of" the CI.  (Docs. 37 at 3:23-4:8, 4:18-23; 32 at 1).  The Government responds that the CI "will not be a witness in the trial" and thus does not need to be disclosed.  (Doc. 37 at 6:2-12).

## II.  MOTION TO SUPPRESS STANDARD

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution.  The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment."  *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted).

## III.  ANALYSIS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures… ."  U.S. CONST. amend. IV.  In some circumstances, it is acceptable under the Fourth Amendment for police to stop citizens and detain them briefly to investigate a reasonable suspicion that the person has engaged or is about to engage in criminal activity.  *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968).  Police-citizen encounters are divided into three tiers to analyze possible Fourth Amendment violations: "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests."  *United States v. Matchett*, 802 F.3d 1185, 1191 (11th Cir. 2015) (quoting *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006)).

Tier I "[c]onsensual encounters between police officers and citizens do not trigger Fourth Amendment safeguards." *United States v. Santibanez Garcia*, 132 F. Supp. 2d 1338, 1341 (M.D. Fla. 2000) (footnote omitted). In Tier II encounters, "law enforcement officers may seize a suspect for a brief, investigatory … stop where (1) the officers have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity, and (2) the stop was reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012) (alteration in original) (quoting *United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011)).

To determine whether reasonable suspicion exists, an officer conducting a stop must have "a reasonable, articulable suspicion based on objective facts that a person has engaged in, or is about to engage in, criminal activity." *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)). "Reasonable suspicion is determined from the totality of the circumstances and from the collective knowledge of the officers involved in the stop." *United States v. Glinton*, 347 F. App'x 453, 454 (11th Cir. 2009) (internal citations and quotations omitted). The Court views "the totality of the circumstances in the light of the officer's special training and experience because behavior, seemingly innocuous to the ordinary citizen, may appear suspect to one familiar with [criminal] practices." *Matchett*, 802 F.3d at 1191 (alteration in original) (citation and internal quotation marks omitted); see also *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991) ("[A] reviewing court must give due weight to the officer's experience"). "[A]n 'inchoate and unparticularized suspicion' or 'hunch' of criminal activity is not enough to satisfy the

6

minimum level of objectivity required." *United States v. Perkins*, 348 F.3d at 965, 970 (11th Cir. 2003) (citation and internal quotation marks omitted). Further, when evaluating the totality of the circumstances, the Court does not consider each fact in isolation. *See United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002).

### A.   Lawful Basis for the Stop

The Government gives two independent reasons it says demonstrate that the officers had reasonable suspicion to stop Cartwright. First, the officers possessed a reasonable suspicion from the CI's tip that Cartwright, a convicted felon, was in possession of a firearm. (Doc. 40 at 3-4). Second, the officers possessed reasonable suspicion that a narcotics crime was underway based on the smell of marijuana. (Doc. 40 at 4-5). The Court analyzes these two theories bearing in mind that under the totality of the circumstances standard, no individual fact is considered in isolation. *Hunter*, 291 F.3d at 1306.

#### 1.   The Tip

As to the tip, the CI stated that Cartwright was in possession of a gun at 608 South Jefferson Street. (Doc. 37 at 18:22-19:3). Cartwright argues that the stop was unlawful because "there were no factual bases … to indicate the Defendant was armed and dangerous and the allegations [by the informant] did not provide sufficient indicia of reliability" to justify the stop. (Doc. 27 at 3).

Courts in this circuit have concluded that "[s]tatements from confidential or anonymous sources must be considered with care …[, b]ut they still may provide or contribute to a basis for finding probable cause or reasonable suspicion if, in the totality of the circumstances, the information is sufficiently reliable." *United States v. Wilkins-*

7

*01*, 2014 WL 3099751, at *6 (N.D. Ga.) (citing *Ortega v. Christian*, 85 F.3d 1521 (11th Cir. 1996)). Reasonable suspicion is considerably less than the requirement of probable cause that evidence of a crime will be found. *United States v. Tapia*, 912 F.2d 1367 (11th Cir. 1990).

Citing *Florida v. J.L.*, Cartwright argues suppression is warranted because an *anonymous tip* of a person carrying a gun along with that person's description does not provide "sufficient indicia of reliability" to justify a police officer's stop of that person. (Doc. 27 at 3) (citing *J.L.*, 529 U.S. 266, 274 (2000)). However, the Supreme Court in *J.L.* concluded that "an anonymous tip that a person is carrying a gun is, *without more*, [in]sufficient to justify a police officer's stop and frisk of that person." *Lindsey*, 482 F.3d at 1291 n.3 (emphasis in original) (quoting *J.L.*, 529 U.S. at 268). Here, as discussed below, there is more. In any event, this case involves a CI, not an anonymous tip. In *Ortega*, the Eleventh Circuit outlined factors for courts to consider in reviewing the reliability of a CI's statements: whether the informant made a statement against his penal interests; whether there is a past history between the informant and the police department supporting his reliability; whether the informant had personal knowledge; and whether there was independent police work to investigate and verify the tip. 85 F.3d at 1525. Also, a reliable CI exhibits "sufficient indicia of reliability" to establish reasonable suspicion when corroborated with independent police work. *United States v. Baggin*, 354 F. App'x 396, 398-99 (11th Cir. 2009) (emphasis added).

The Government primarily relies on *United States v. Heard* to support its argument that the CI provided the officers with reasonable suspicion. 367 F.3d 1275 (11th Cir. 2004). In *Heard*, a police officer responding to an argument received a face-

8

to-face anonymous tip that one of the individuals had a gun in his waistband. *Id.* at 1276-77. The officer approached the person, frisked him for weapons, and found a gun in his waistband. *Id.* at 1277. The question to the Eleventh Circuit was whether the anonymous face-to-face tip exhibited "sufficient indicia of reliability" to justify a stop. *Id.* at 1280. The court concluded that the face-to-face nature of the meeting exhibited "sufficient indicia of reliability" because it allowed the officer to accurately assess the anonymous informant's reliability. *Id.* In other words, because the officers "[had] an opportunity to observe the demeanor and perceived credibility of the informant," the reliability of the information rose to a level supporting a *Terry* stop. *Id.*

In this case, there are even more factors than in *Heard* that weigh in favor of finding the CI credible and thereby exhibiting "sufficient indicia of reliability." At the suppression hearing, there was uncontroverted testimony that the CI previously met with Detective Khan in a face-to-face meeting, previously provided reliable information regarding citizens with probation warrants, never provided inaccurate or unreliable information, recently provided information regarding the purchase of the specific gun at issue that was corroborated by another agency, and accurately gave the location of Cartwright the night of the stop. (Doc. 37 at 17:5-18:6, 29:24-30:9, 33:10-12). The police officers also had knowledge that Cartwright was a convicted felon. (Doc. 37 at 19:15-21). Finally, the police confirmed part of the CI's tip as to his identity and location when he was observed outside of 608 South Jefferson Street based on independent police surveillance the night of the encounter. (Doc. 37 at 22:20-24). These observations independently corroborated the CI's statements.

9

Although Cartwright does not appear to challenge the CI's basis of knowledge for the tip, it is a factor that is considered in the reliability analysis. *Ortega*, 85 F.3d at 1525. Even so, that fact, considered alongside the other substantial factors, leads to the conclusion that the information from the CI contained "sufficient indicia of reliability" to justify a stop and that it was corroborated by other independent police work. *Riley v. City of Montgomery*, 104 F.3d 1247, 1251-52 (11th Cir. 1997) (concluding that under the "totality of the circumstances," information even *partially* corroborated by independent police work was sufficient to constitute reasonable suspicion). All in all, the CI's tip alone satisfies the reasonable suspicion requirement.

### 2. The Marijuana

As to the marijuana, both police officers testified that they experienced the "intense" and "pungent" smell of marijuana when they approached Cartwright. (Doc. 37 at 78:10-16, 51:5-7). Cartwright disputes this, arguing that the "officers would not have objectively observed the odor of marijuana until after [Cartwright] had already been detained." (Doc. 38 at 5). This, Cartwright continues, is because the marijuana was "packaged under multiple layer of plastic under multiple layers of clothes." (Doc. 38 at 6). It is "clearly established that the recognizable smell of marijuana gives rise to probable cause supporting a warrantless search." *United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982). The Eleventh Circuit has affirmed this in two invasive search contexts: the home search and the vehicle search. *United States v. Johnson*, 445 F. App'x 311, 313 (11th Cir. 2011) (detection of the odor of marijuana supported probable cause for a warrantless vehicle search); *United States v. Tobin*, 923 F.2d 1506, 1512

10

(11th Cir. 1991) (detection of the odor of marijuana supported probable cause for warrantless search of a house).

The Government cites *United States v. Smith*, 596 F. App'x 804 (11th Cir. 2015), for the same proposition. In *Smith*, a police officer approached two men sitting at a picnic table outside an apartment. *Id.* at 805. The officer observed the men smoking what appeared to be marijuana and returning ever so often to a car parked nearby. *Id.* Upon approaching the two men, the officer smelled marijuana and after discovering it was in fact marijuana, proceeded to perform a search incident to arrest. *Id.* The officer asked to search the nearby car. *Id.* The two men did not consent to the search, but the officer proceeded to search the trunk where he discovered marijuana and a gun with a loaded magazine. *Id.* at 806. At the suppression hearing the officer testified that his search was reasonable because he smelled fresh marijuana from outside of the car through the car's halfway-open windows. *Id.* The Eleventh Circuit affirmed the trial court's determination that the smell from the car justified the search, concluding that nothing in the officer's testimony was "contrary to the laws of nature, inconsistent, or improbable on its face" and therefore was a constitutionally allowable search. *Id.* at 807.

Cartwright attempts to make a distinction between "objective" observations of the marijuana versus the officers' "subjective" intentions to stop Cartwright because of the information from the CI. (Doc. 38 at 5). This argument is misplaced. The officers' "subjective" intentions were actually the objective basis for stopping Cartwright to inquire about the gun. In any event, before the officers could even inquire about the gun, Sergeant McNeely testified that he could smell the "pungent" odor of marijuana.

11

(Doc. 37 at 78:10-16). Officer Chapple also testified he could smell the odor. (Doc. 37 at 51:5-7). This alone created an objective reason for the stop before any stop based on the information that Cartwright had a gun. *See Whren v. United States*, 517 U.S. 806, 813 (1996). The Court finds the officers' suppression hearing testimony credible as to the smell of marijuana.[1] (Docs. 38 at 5; 37 at 78:10-16, 51:5-7). To conclude otherwise would be to assume that McNeely's statement that he could smell marijuana was only a lucky guess. Accordingly, given that the smell of marijuana is sufficient to establish probable cause, the officers necessarily possessed an objective, reasonable suspicion to justify the *Terry* stop.

Even more, "[r]easonable suspicion is determined from the totality of the circumstances and from the collective knowledge of the officers involved in the stop." *Glinton*, 347 F. App'x at 454 (internal citations and quotations omitted). Simply put, the dual justifications—the information from the CI and the smell of marijuana, considering the totality of the circumstances—were enough to show there was reasonable suspicion to stop Cartwright.

Because the officers possessed reasonable suspicion, they necessarily could conduct a pat down of Cartwright. The pat down led to the discovery of the gun. The discovery of the gun, along with the smell of marijuana, on a person they knew to be a convicted felon, gave the officers probable cause to arrest Cartwright. *See United States v. Burch*, 466 F. App'x 772, 775 (11th Cir. 2012) ("The officers' knowledge of Burch's gun possession, combined with their reliable information that Burch was a

---

[1] The marijuana was admitted into evidence at the suppression hearing. (Doc. 37 at 55:3-56:13). The marijuana was packaged just as it was when seized from Cartwright; plus it was placed in a sealed plastic evidence bag. The Court does not rely on its own olfactory senses in reaching its decision. However, the marijuana was pungent that day.

12

convicted felon, established probable cause to arrest Burch."); *Lueck*, 678 F.2d at 903; *United States v. Lindsey,* 482 F.3d 1285, 1292 n.4 (11th Cir. 2007). The arrest subsequently allowed the officers to perform a search of Cartwright which led to the discovery of the marijuana. Therefore, neither the suppression of the gun nor the marijuana is warranted.

### C. Cartwright's Statements

Cartwright, without any citation to authority, argues that he was "illegally detained[2] without being read any *Miranda* warnings when he was told to put his hands on his head …." (Doc. 38 at 6). Therefore, "any incriminating statements as to having marijuana on his person after that point cannot be used to support a basis for his subsequent search." *Id.* This argument is without merit.

It is well established that "[a] person taken into custody must be advised of his right to remain silent and his right to counsel prior to any interrogation." *United States v. Muegge*, 225 F.3d 1267, 1269-70 (11th Cir. 2000) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)). "*Miranda* warnings are required only when a defendant is 'in custody,' meaning that there has been either a formal arrest or a restraint on the defendant's freedom of movement that is of the degree associated with a formal arrest." *United States v. Partin*, __F. App'x__, 2015 WL 9022251, at *6 (11th Cir.). This determination is made by considering the totality of the circumstances. *Id.* "However, *Miranda* only applies where a person in custody is subjected to either express questioning or its

---

[2] There was conflicting testimony about whether officers did a pat down or a search incident to arrest. To the extent that Officer Chapple referred to the pat down for the gun as a search incident to arrest, he was mistaken at least in terms of legal nomenclature. *See Minnesota v. Dickerson*, 508 U.S. 366 (1993). In *Dickerson*, the Supreme Court held that "a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Id.* at 375–76.

13

functional equivalent[,]" which refers to "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *United States v. Young*, 377 F. App'x 965, 968-69 (11th Cir. 2010) (citations and internal quotation marks omitted). "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda]." *United States v. Ubaldo–Viezca*, 398 F. App'x 573, 580 (11th Cir. 2010) (alteration in original) (quoting *Miranda*, 384 U.S. at 478).

In the context of a *Terry* stop, "a suspect who is detained … is not free to leave from the beginning of the stop until it ends. If we applied the general *Miranda* custodial test literally to *Terry* stops, the result would be that *Miranda* warnings are required before any questioning could occur during any *Terry* stop." *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). The appropriate inquiry in this context is whether the encounter involved a highly coercive atmosphere—that is, whether the totality of the circumstances was such "that a reasonable person in [Cartwright's] position would [not] have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." *Id.* at 1150. Factors considered include the purpose served by the detention, the officers' diligence in pursuing the investigation, the "scope and intrusiveness of the investigation," and the detention's duration. *Partin*, __F. App'x__, 2015 WL 9022251, at *6.

It appears that Cartwright is attempting to argue that either before or at the time he was told to put his hands on his head, he was "in custody" and therefore should have been advised of his *Miranda* rights. As an initial matter, Cartwright bears the burden of

14

establishing that he was in custody for purposes of interrogation *and* that his statements were made in response to Government questioning. *United States v. Peck*, 17 F. Supp. 3d 1345, 1353 (N.D. Ga. 2014) (citing *United States v. de la Fuente*, 548 F.2d 528 (5th Cir. 1977)).[3] However, Cartwright makes no attempt to show he was interrogated beyond a conclusory statement that he was "interrogated." (Doc. 38 at 6). Therefore, Cartwright has failed to satisfy his burden that he was subject to custodial interrogation and thus that he needed to be advised of his *Miranda* rights. *Peck*, 17 F. Supp. 3d at 1355.

In any event, under the totality of the circumstances, the Court concludes that Cartwright was not in custody when he made the statement about weed. In other words, he was not under "formal arrest or a restraint on [his] freedom of movement that [was] of the degree associated with a formal arrest." *Partin*, __F' App'x__, 2015 WL 9022251, at *6. Without any warning lights or his siren on, Officer Chapple arrived in front of the house where Cartwright was standing and started asking him about why he was back in town. (Doc. 37 at 42:3-43:16, 61:21-25). *See United States v. Partin*, 2013 WL 6388592, at *6 (M.D. Ala.) (considering the fact the officers did not use their blue lights in determining the defendant was not in custody) *aff'd by* __F. App'x__, 2015 WL 9022251 (11th Cir.). Then, without his warning lights or sirens on, Sergeant McNeely arrived and, while walking up, asked Cartwright to put his hands on top of his head twice before saying "You think I can't smell that?" (Docs. 37 at 46:22-24, 47:22-25, 65:2-10, 72:6-11, 78:10-16; 33-3 at 0:20-0:31 ). Although Cartwright's putting his hands on his head was restrictive, "[n]ot all restraints on a person's freedom of movement

---

[3] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

15

constitute custody for purposes of *Miranda*." *Partin*, __F' App'x__, 2015 WL 9022251, at *6. Indeed, the restriction on freedom of movement *alone* "is not sufficient to transform a *Terry* stop into a de facto arrest." *Acosta*, 363 F.3d at 1146.

Rather, the relevant inquiry is whether the "environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.* (alteration in original). Here, the encounter occurred in a "neutral setting" and not in a "police interrogation facility," Cartwright was not in handcuffs when he made his statement about the "little bit of weed on him," and the scope and duration of the detention were reasonable under the circumstances. *See Partin*, 2013 WL 6388592, at *6. Thus, before Cartwright made his statement about the weed, "the stop did not evolve into a custodial detention for which *Miranda* warnings were required." *Partin*, __F. App'x__, 2015 WL 9022251, at *7.

Later, when the gun was discovered, Cartwright, unprovoked, stated that the gun was not loaded. (Docs. 37 at 49:15-17, 52:22-53:6; 33-3 at 0:56-1:07). Then, when Cartwright was being taken to the police cruiser, he said that "You're a dummy if you don't have a gun out here these days." (Doc. 33-3 3:19-3:22). There is no evidence that either of these statements were made in response to government questioning. In other words, Cartwright made these statements voluntarily, and thus, they are not subject to *Miranda* protections. *See Ubaldo-Viecza*, 398 F. App'x at 580. Therefore, the suppression of Cartwright's statements is not warranted.[4]

---

[4] The Court also notes that Cartwright's statement regarding marijuana possession may well be irrelevant to the charge for felon in possession of a firearm for which he was indicted.

### D.      Disclosing the Identity of the CI

Finally, Cartwright moves to compel the disclosure of the identity of the CI in order to "corroborate [a] justification defense" and to "ascertain the reliability of" the CI. (Docs. 37 at 3:23-4:8, 4:18-23; 32 at 1).  The Government responds that the CI "will not be a witness in the trial" and consequently does not need to be disclosed. (Doc. 37 at 6:2-12).

Generally, the government enjoys a limited privilege to withhold the identity of its informants.  *Roviaro v. United States*, 353 U.S. 53, 59-61 (1957).  To determine whether disclosure of an informant's identity is appropriate, "a court must engage in a balancing test, taking into account the particular circumstances of each case, the crime charged, possible defenses, and the potential significance of the informant's testimony."  *United States v. Gutierrez*, 931 F.2d 1482, 1490 (11th Cir. 1991) (citing *Roviaro*, 353 U.S. at 62).  This inquiry focuses on three factors: "(1) 'the extent of the informant's participation in the criminal activity'; (2) 'the directness of the relationship between the defendant's asserted defense and the probable testimony of the informant'; and (3) 'the government's interest in nondisclosure.'"  *United States v. Flores*, 572 F.3d 1254, 1265 (11th Cir. 2009) (quoting *United States v. Tenorio-Angel*, 756 F.2d 1505, 1509 (11th Cir. 1985)).

The burden is on defendants to "prove that the informant's probable testimony would bear a direct relationship on the defendant's asserted defense.  However, '[m]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure.'"  *United States v. McDonald*, 935 F.2d 1212, 1217 (11th Cir. 1991) (alteration in original) (citations omitted).  Cartwright contends, in a

17

conclusory fashion, that the identity of the CI would be relevant to his defense of justification for the possession of the gun.  That contention is without merit.  Clearly, based on the facts in the record, the CI's potential testimony relates only to the reasonableness of the stop.

Cartwright next argues that disclosure of the CI's identity is warranted because the CI's information "formed the factual basis for the search and arrest" of Cartwright. (Doc. 32 at 2).  If the *Roviaro* test turns on the relationship between a CI and the charge against a defendant and any defense to the charge, then a defendant who seeks a CI's identity only to challenge the reasonableness of a stop cannot pass the test.

Unfortunately for Cartwright it has long been the law in the Eleventh Circuit, and the old Fifth Circuit, that *Roviaro* does turn on that relationship.  "[T]he rule is well-established that the Government need not disclose the identity of an informer when the sole purpose to be served is to attack the probable cause supporting a search warrant." *United States v. Freund*, 525 F.2d 873, 876-77 (5th Cir. 1976); *United States v. Mendoza*, 433 F.2d 891, 894 (5th Cir.1970); *see also United States v. Booker*, 131 F. App'x 235, 241 (11th Cir. 2005) (denying request for disclosure where the CI's testimony would only have been relevant for determining whether there was probable cause to search the defendant's residence).  Other circuits have concluded the same. *See, e.g.*, *United States v. Hollis*, 245 F.3d 671, 674 (8th Cir. 2001); *United States v. Gray*, 47 F.3d 1359, 1365 (4th Cir. 1995).

Thus, the Government need not disclose the CI's identity where the sole purpose of disclosing the informer's identity is to attack probable cause.  *Freund*, 525 F.2d at 876-77; *Mendoza*, 433 F.2d at 894; *Booker*, 131 F. App'x at 241.  The same is true in

this case to attack a preliminary issue of reasonable suspicion. *See Wilkins-01*, 2014 WL 3099751, at *10. (noting where a defendant sought a CI's identity to attack a *Terry* stop, "that a defendant has a substantially lesser claim for disclosure 'where the issue is the preliminary one of probable cause, and guilt or innocence is not at stake'" (quoting *McCray v. Illinois*, 386 U.S. 300, 311 (1967))); *see also United States v. Goode*, 486 F. App'x 261, 264-65 (3d Cir. 2012).

In sum, Cartwright fails to satisfy any of the *Roviaro* factors. As to the first, there was no testimony that the CI participated in the criminal conduct. *Vann*, 336 F. App'x at 950. As to the second, while Cartwright anticipates asserting a justification defense, Cartwright has not shown any relationship between this defense and the potential testimony of the CI. Further, the Government does not plan to call the CI as a witness. *McDonald*, 935 F.2d at 1217. As to the third, Cartwright has not challenged the Government's interest in protecting the identity of the informant. *See Roviaro*, 353 U.S. at 59 (recognizing the Government's interest in preserving the anonymity of "persons who furnish information of violations of law to officers charged with enforcement of that law" to "encourage them to [continue] to perform that obligation").

### IV. CONCLUSION

For the foregoing reasons, Cartwright's motions to suppress and to compel the Government to reveal the CI's identity are **DENIED**. (Docs. 27; 32).

**SO ORDERED**, this 20th day of April, 2016.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT
